349 P.2d 1029

Joe JACKSON and Mountain States Mutual Casualty Company, Plaintiffs-Appellees,

v.

SOUTHWESTERN PUBLIC SERVICE COMPANY, a corporation, Defendant-Appellant.

No. 6610.

Supreme Court of New Mexico.

March 3, 1960.

Hervey, Dow & Hinkle, Roswell; Gib- son, Ochsner, Harlan, Kinney & Morris, J. Hadley Edgar, Jr., Amarillo, for appellant.

Sutin & Jones, J. L. Leftow, Albuquer- que, for Joe Jackson.

PAYNE, District Judge.

This is a damage suit for personal injuries sustained by Joe Jackson when he fell into a hole in a street at Santa Rosa, Guadalupe County, New Mexico, on July 26, 1955.

Although Joe Jackson and Mountain States Mutual Casualty Company are both named as plaintiffs and appellees, this opinion will concern only one plaintiff, namely, Joe Jackson, since the interest of Mountain States Mutual Casualty Company was taken care of by agreement of the parties and the jury entered their verdict on behalf of Joe Jackson only. There was also another defendant in the case, namely, the Town of Santa Rosa, New Mexico, but the jury also rendered a verdict in their favor. Hence, this opinion will discuss the matter insofar as it pertains to Joe Jackson as plaintiff and appellee, and Southwestern Public Service Company, a corporation, defendant and appellant.

Several weeks before the accident happened, the Southwestern Public Service Company had dug a hole in the street in order to repair a broken water line. The street was paved and the hole was dug through the pavement down into the dirt surrounding the pipe. After the pipe was repaired, the hole was filled up with dirt and tamped down. At the time of the accident, the dirt had evidently settled so that the hole was dished out, being six to eight inches deep in the middle of the hole and sloping up to the sides. The hole was between four feet and six feet long and between two feet and three feet wide. It was situated up against the sidewalk so that it was in a sort of an oblong shape with the length of the hole running in the same direction as the street, and being next to the curb so that the width of the hole extended two to three feet from the curb into the street. The sides of the hole on all sides sloped up from the center to the edge of the pavement. This hole was almost exactly in front of the post office. The plaintiff had a place of business some two doors down the street from the post office. On the day in question, about the middle of the afternoon, the plaintiff, while on crutches, went from his place of business to the post office to get his mail and then came out of the post office and started to cross the street.

The plaintiff had a half cast on his right leg, which extended about halfway between his knee and ankle down to his foot. He was not able to walk on this leg. He was using crutches, but they were not of the ordinary type. These crutches are what is known as Canadian crutches. They fit the arms, and the person using them can grip them with his hands instead of having them up underneath the armpits. The crutches had rubber tips on the bottom of them. It had rained the night before the accident occurred, and there was some water in the bottom of the hole and the ground in and around the hole was damp. At the time in question, there were several cars parked

along the street next to the sidewalk. However, the cars had not parked where this hole was situated, and there was a gap of between six and eight feet wide between the cars at this point. The plaintiff started to cross the street to go to the doctor's office, which was situated on the other side of the street. At the time, he was in some pain and desired to get a shot for this pain. He could have gone up the street a short distance and crossed, or could have crossed at the street intersection, but, for convenience, the plaintiff decided to cross the street at the place where the hole was situated. He believed that he could cross the street with safety. He put his good foot on the curb next to the hole and intended to step across the hole with his bad leg. He placed his crutches on either side of the hole and attempted to place them as near to the edge of the hole as possible without putting them in the hole. As he stepped, his right crutch slipped off the pavement down into the hole and he fell into the hole and further injured his bad leg.

It will be necessary to give a little background concerning the plaintiff's bad leg, so that the entire situation may be fully understood. In February of 1954, the plaintiff had been working for Loudermilk Brothers in road construction. While so engaged, and while working on a hot mix plant, he was involved in an accident and his right ankle was broken. This was a compound comminuted fracture and his ankle bones were also knocked out of line. This ankle developed osteomyelitis, which is a decayed condition of the bone. This injury had not healed up completely and was still draining at the time of the plaintiff's accident on July 25, 1955, being more than two years later. It was for that reason that the plaintiff was wearing a cast on his leg and was walking with crutches. It was for that reason also that he was going to the doctor to have his wound treated and to get a shot for pain. When he fell in the hole on July 25, 1955, this leg was again broken and the injury was further aggravated. It was for this injury that suit was brought and the jury returned the verdict in favor of the plaintiff and against the defendant, Southwestern Public Service Company, for the sum of $95,000. This appeal followed.

The appellant has set forth fifteen points relied on for a reversal of the judgment. They will be discussed in the order set forth in the brief.

The first four points are grouped together for argument in the briefs. The appellant asserts that the trial court erred in refusing to grant judgment for the defendant notwithstanding the verdict of the jury. The four points are as follows, to wit: (1) That the plaintiff, Joe Jackson, was guilty of contributory negligence as a matter of law; (2) that he voluntarily assumed the risk of crossing the street on crutches at the place where the hole was situated; (3) that the condition of the street was open, obvious

·and plainly visible to the plaintiff; (4) and, that the defendant owed no duty to the plaintiff under such circumstances.

The appellant argues these defenses together, on the ground that the difference is more philosophical than real. The court does not necessarily concur in this conclusion. However, the argument and the briefs on these points really boil down to whether or not the actions of the plaintiff were such as to bar him from recovering against the defendant. As the court views the situation, the main problem is whether or not the plaintiff is guilty of conduct amounting to contributory negligence barring him from a recovery. The knowledge of the plaintiff of the conditions as they existed, the fact that they might be open and obvious, and the question of whether or not the plaintiff assumed the risk of crossing the street in that particular location will be considered under this. heading, although strictly it would be possible to consider them separately. In any event, the defenses are based on the same facts in each instance.

With regard to the question of contributory negligence, the matter has been discussed by our court in a number of cases and by courts in general on numerous occasions. Our rule is so axiomatic that it needs no authority to sustain it, namely, that whether or not a plaintiff has been guilty of contributory negligence barring recovery is ordinarily a matter for the jury under proper instructions. ··However, there is a fur-

ther well established rule to be considered in connection with the general rule. If the minds of reasonable men cannot differ upon the question of contributory negligence under the facts in question, and if they would come readily to the conclusion that the plaintiff was negligent and that such negligence contributed to the injury complained of, the court should so declare. such contributory negligence as a matter of law.

This court has recently had occasion to review the rule relative to the question of when contributory negligence should be submitted to the jury and when it should be declared as a matter of law by the court. Reference is made to the very recent case of Sandoval v. Brown, 1959, 66 N.M. 235, 346 P.2d 551, for a more complete discussion of the question. There were two citations in that case, from previous cases decided by us, which we held to be correct statements of the law.

One of these is a quotation from Gray v. Esslinger, 1942, 46 N.M. 421, 130 P.2d 24, at page 27, which reads as follows:

"We are not unmindful of the prevailing rule that plaintiff's contributory negligence, if any, ordinarily is a question for the jury. Notwithstanding this general rule, however, where reasonable minds cannot differ upon the question and they come readily to the conclusion that the plaintiff was negligent and that his negligence con-

tributed proximately with that of defendant to cause the injury complained of, it should be so declared as a matter of law. (Citing cases.)"

The other quotation is from Williams v. Haas, 1948, 52 N.M. 9, 189 P.2d 632, at page 634, which reads as follows:

"Whether the plaintiff has been guilty of contributory negligence barring a recovery is nearly always a question for the jury under proper instructions by the court. It is rarely the case the facts are such that the court can say as a matter of law that plaintiff is himself such an offender against the rules of the road as to deny him recovery. Yet, on occasions it does thus appear and when it does, the court should not and will not hesitate so to declare. Gray v. Esslinger, 46 N.M. 421, 130 P.2d 24, and cases cited. We think this is not such a case, even though strongly relied upon by counsel for defendant in support of the motion to dismiss."

■ Let us begin the consideration of the question by stating that the burden of proving contributory negligence is on the defendant. The defendant did not put any witness on the stand to testify about the matter. The sole testimony is that of the plaintiff himself. No doctor and no person who had ever walked on crutches was placed on the stand. No statement was made as to how wide apart crutches may be placed with safety while stepping. No statement was made as to how long a step can be taken with safety while on crutches.

■ The sole and only evidence concerning negligence is the fact that the plaintiff fell, plus a statement on cross-examination, after much crowding, that the place was the most dangerous one on the block. The place might be more dangerous than some other spot and still not be so dangerous that a person would be guilty of contributory negligence as a matter of law to try and cross it. This court has held that mere knowledge that a walk is defective is not enough to constitute contributory negligence. Williams v. City of Hobbs, 1952, 56 N.M. 733, 249 P.2d 765. Even if a walk is defective, if a reasonably prudent person believes he can cross it with safety, the knowledge of such defect does not constitute contributory negligence as a matter of law.

The plaintiff repeatedly testified that he did not know that it was dangerous. The following statements are not in consecutive order, but were picked from the testimony to show that the plaintiff did not realize that the defect was dangerous:

"Q. Mr. Jackson you were afraid that you would fall down there that day, weren't you? A. No sir, I wasn't."

\* \* \* \* · \* \*

"Q. Because you thought if you got your crutch in that hole you would fall

down, didn't you? A. No, sir, there's a wide opening between the cars where I thought I could get through easily."

\* \* \* \* \* \*

"Q. All right then, it is true that you did select the only route you knew to be dangerous? A. As to being dangerous, I didn't know it would be dangerous to walk across there."

The only thing to convict the plaintiff of contributory negligence is the existence of the hole and the fact that he fell. This does not make out a case where reasonable minds would not differ. Under this testimony of the plaintiff and the lack of any testimony to the contrary, the mere fact that the plaintiff tried to step over the hole while wearing crutches does not make out such a clear and convincing case that the minds of reasonable men might not differ as to the question of contributory negligence. Under this state of the record, we do not feel that we are at liberty to ignore the judgment of the trial judge and the jury and state positively as a matter of law that the plaintiff is guilty of contributory negligence. We feel that it was a case for a jury to determine the facts as any other disputed fact in the case, and that the defendant did not carry the burden of proof far enough that we would be justified to grant judgment non obstante veredicto.

In points 5 and 6, the defendant alleges that the trial court erred in instructing the jury that it could not award damages in excess of $250,000 in instruction No. 24, and that it erred in stating that the damages could not exceed the amount sued for in instruction No. 40.

In its instruction No. 1, the court advised the jury that the plaintiff was asking for damages in the sum of $250,000. These later instructions merely advised the jury that it could not award damages for more than the amount sued for. It is true that instruction No. 24 did not specifically state that this was the amount sued for, but such fact had already been brought to the attention of the jury. It is, of course, better to always point out, when mentioning the amount, that it is the sum sued for by the plaintiff so that the jury will understand the reason for mentioning the amount. However, in this case, the instructions, taken as a whole, clearly point this out; and we hold that it was not error to state that the jury cannot award more than the amount sued for, being said sum of $250,000.

This practice has been going on in New Mexico for many years and is generally adhered to by the trial courts. The weight of authority sustained this practice. See 25 C.J.S. Damages § 179(b), p. 870; and 2 A.L.R.2d 454, 461.

Some cases condemn frequent mention of the amount of damages and it is well to avoid repetition of the amount. However, in this case the actual amount was only

mentioned twice, once in the statement of the case and once in the instruction on the measure of damages. In one other instruction on damages, it merely mentioned that the damages should not exceed the amount sued for without mention of the amount. We do not consider this as error.

As point No. 7, the plaintiff has assigned error on the part of the trial court in instructing the jury that the reasonable amount of "Jackson's medical expenses could not exceed $7,768.87 which had been expended for such purposes since July 26, 1955," because no evidence was before the jury to support this figure. A little background might be necessary in order to understand this point. There were two plaintiffs in the case, namely, Joe Jackson and Mountain States Mutual Casualty Company. When the plaintiff Joe Jackson had completed his case and rested, the Mountain States Mutual Casualty Company, through its attorney, Hugh Horne, made a statement concerning a stipulation, and certain statements were made by the other parties. In order for everyone to understand this matter, the record will be quoted as follows:

"Mr. Horne: May it please the Court, it has been stipulated between the parties hereto that Mountain States Mutual Casualty Company has expended by way of Workmen's Compensation benefits $5,280.00 in compensation; $7,768.87 in medical.

"The Court: That is up until including what date?

"Mr. Horne: To date as of December 3. I will also move the Court to amend our Complaint to those figures, the total of those two figures.

"The Court: Is there any objection to the amendment?

"Mr. Moise: No objection, your Honor.

"The Court: All right.

"Mr. McLeod: No objection to the amendment. What about the rest of the statements, Mr. Harlan?

"Mr. Harlan: May it please the Court, we don't have any objection to the amendment, and we don't have any objection to the figures as we say the figures are between Mr. Jackson and the Mountain States Mutual. Now, if it is proposed that those figures were in any way to go to the Jury, we certainly object.

"The Court: No, no, those figures will not go to the Jury."

The plaintiff Joe Jackson did not put in any evidence whatsoever of his expenses, doctor bills, hospital bills and other similar items. Evidently, all that the Mountain States Mutual Casualty Company was interested in was the securing of its expenses out of any judgment given to the plaintiff Joe Jackson. Due to the situation, some

misunderstanding must have arisen. Be that as it may, no independent evidence of these bills was placed in the record, and the only thing before the court at this time is the foregoing stipulation. It is clear from that stipulation that the defendant, Southwestern Public Service Company, did not consent for these figures to go to the jury, and it was the understanding of said defendant that the stipulation was to bind the two plaintiffs only. Under this state of the record, it was error to instruct the jury to consider this item of damage, since the defendant did not have an opportunity to cross-examine the witnesses concerning these expenses, nor was there any testimony in the record that such expenses were necessary and reasonable.

The following statement is found in 5A C.J.S. Appeal and Error § 1773(4), p. 1263, which reads as follows:

"An error in an instruction on the measure of damages may be cured by the entry of a remittitur for the amount erroneously authorized."

█ Under the foregoing situation, we feel that error has been committed, and that unless the plaintiff will enter a remittitur herein within 15 days from the entry of this decision, by which the plaintiff remits the sum of $7,768.87 from the judgment, the judgment will be reversed and remanded for a new trial. However, if the plaintiff will remit said sum within said period, the judg-

ment will not be reversed for that error. However, since there is to be a further statement concerning remittitur in this decision, the entire matter of remittitur will be further mentioned after the discussion of all the points and as a part of the closing of this decision.

As its point 8 for reversal, the defendant complains of an instruction to the jury that it could consider "the value of the right limb of the plaintiff, Joe Jackson," stating as its reason for this assignment of error that this instruction allowed the jury to consider a loss of earning capacity on the part of the plaintiff and that there was no evidence in the record concerning a diminished earning capacity.

█ The court was not specific in referring to a loss of earning capacity on the part of the plaintiff. The only reference to it in the instructions was the above statement. The plaintiff attempted to put in some evidence concerning his wages before the original injury and it was objected to and the court sustained the objection. The plaintiff also attempted to put in some testimony concerning a loss in his cleaning business, and this was objected to and the objection was sustained. In a case of this kind, a plaintiff may show any diminution in his earning capacity that he desires by proper evidence. However, we believe that, in the absence of such evidence, the jury can consider the matter of the loss of the limb, and that it may award substantial

damages for such loss without any testimony concerning the decrease in the earning capacity of the plaintiff.

In the case of Turrietta v. Wyche, 1949, 54 N.M. 5, 212 P.2d 1041, 15 A.L.R.2d 407, we quoted with approval from the case of Storrs v. Los Angeles Traction Co., 1901, 134 Cal. 91, 66 P. 72, 73.

The Supreme Court of California, in the Storrs case, said this:

"If the circumstances which were before the jury show that by reason of the injury he has become unable to perform the labor or transact the business which he was accustomed to transact or perform prior thereto, he is entitled to recover damages therefor; and from the nature of the investigation the amount of such recovery must be left to the wise discretion of the jury. It needs no evidence to show that a plaintiff in full health and vigor, who has lost an arm or a hand by reason of the negligence of the defendant, has had his earning power greatly impaired; and in such a case a jury would not be limited to nominal damages, although there should be no evidence that he was in the receipt of wages at the time of the injury, but would be authorized to give substantial damages."

The Storrs case has been followed by the Supreme Court of California in various decisions. Lindemann v. San Joaquin Cotton Oil Co., 1936, 5 Cal.2d 480, 55 P.2d 870; Ridley v. Grifall Trucking Co., 1955, 136 Cal.App.2d 682, 289 P.2d 31; Connolly v. Pre-Mixed Concrete Company, 1958, 49 Cal.2d 483, 319 P.2d 343.

■ From the foregoing, it appears to us that it was not error for the trial court in this case to give the instruction which it gave, even in the absence of evidence of the earnings of the plaintiff before or after the injury. There was evidence as to his age, occupation, previous health, and of the amputation of his leg. Under the foregoing doctrine, it was not error for the jury to consider the loss of his leg in arriving at the verdict, even in the absence of evidence of the earnings of the plaintiff before and after the accident. Other cases have been examined by the court along this same general line, but it is felt that it is not necessary to give further citations or illustrations.

As point 9, the appellant has contended that the trial court erred in instructing the jury that if it found for the plaintiff, it should award the plaintiff such damages as will compensate him for "all detriment suffered" by him. Appellant contends that such a phrase is general, vague and indefinite and that there was no evidence to sustain it.

■ In Webster's New International Dictionary, Second Edition, the first defini-

tion of the word "detriment" is given as follows:

"Injury or damage, or that which causes it."

We believe that it was this definition which the court had in mind when it used the word in the instruction.

■ We believe that the word could be properly used in an instruction when the context of the language shows that it is referring to the damages or injuries suffered by the plaintiff. As used in the instruction, it was not vague or indefinite and we do not feel that the jury was misled by its use in any way. The word, as used in the instruction, referred to the damages or injuries suffered by the plaintiff, and it was not error to use it.

■ As its point No. 10, the defendant assigns error on the part of the trial court in repeatedly referring to the injuries of the plaintiff and pain and suffering. We have carefully reviewed these instructions, and feel that this assignment of error has no substantial basis. We do not believe that these items were mentioned more than was reasonably necessary in order to properly instruct the jury.

■ As its point No. 11, the appellant assigns error in the overruling of its objections to the instructions as a whole. The appellant takes the attitude that it contained isolated paragraphs rather than a continuous and logical statement of the case, and that such was confusing and misleading to the jury. The court has read the instructions and feels that this assignment is without merit.

Points 12 and 13 raised by the appellant as grounds for reversal refer to a limitation as to certain evidence. A little background will be necessary in order to intelligently state these contentions. The Southwestern Public Service Company operated in the Town of Santa Rosa under ordinances Nos. 82 and 83. These are exactly alike, except that one covered water and the other power. Each contained a clause that required the company, when work was done in the streets, to restore the street within a reasonable time to its original condition as nearly as possible, and provided that such work was to be done subject to the approval and supervision of the town or such person as it designated.

The ordinances were admitted in evidence. The appellant put on testimony to the effect that their manager had instructions from the mayor to carry on a practice which the company had previously followed. This practice was to report to an employee of the State Highway Department whenever a hole was opened in the street (which was apparently oiled) and that the employee of the Highway Department would repair the opening when he had material to do so. Upon the request of the plaintiff, this testimony was limited by the trial court

to the question of liability between the defendants, Town of Santa Rosa and Southwestern Public Service Company. It was not to affect the claim of the plaintiff against either defendant. The appellant complains of this ruling under points 12 and 13. It is its contention that the appellant was abiding by the ordinances when it did what the mayor instructed it to do, and that the ordinances could not be introduced to show its liability and then limit the testimony as above mentioned. It further contends that since the jury found in favor of the Town of Santa Rosa, that it should have found in favor of Southwestern Public Service Company, although this last contention was not really covered in the points. This contention amounts to a claim that the verdict was not consistent and that if the Town of Santa Rosa was found to be free from liability, that it amounts to a finding that the appellant is likewise free from liability and that the judgment should exonerate it.

 We shall first discuss the question of whether or not the trial court erred in limiting the testimony concerning the instructions from the mayor to the case between the Town of Santa Rosa and appellant. The appellant contends that if it followed the instructions of the mayor that it constituted compliance with the ordinances and protected it from liability to the plaintiff.

The construction placed on the ordinance by the appellant is that the provision for restoring the streets to their previous condition must give way to the provision that it is to be done subject to the supervision and approval of the town. In other words, it takes the position that if it did what the mayor directed, that it would not be liable, even though the mayor failed to instruct it to restore the street to its previous condition, or consented that someone else could do this work. We do not construe the ordinance that way. It provides that the street is to be restored to its previous condition. The fact that it allows the town to approve and supervise this restoration does not give the mayor the right to completely dispense with the restoration, nor to allow the street to remain in a state of disrepair for an unreasonable time. The ordinance was a solemn enactment of the governing body of the municipality and could not be changed by some private arrangement between the mayor and the appellant. There was no showing that the board of trustees of the town had ever authorized the practice testified to. The fact that the mayor is the chief executive officer of the town does not authorize any variation in the ordinance.

It is true that violation of an ordinance may be excused or justified in certain cases. The rule is well stated in the recent case of Alarid v. Vanier, 1958, 50 Cal.2d 617, 327 P.2d 897, 898, decided by the Supreme Court of California on July 17, 1958. That case in-

volved the violation of a statute, but we think the law is applicable. The court first stated as follows:

> "The presumption of negligence which arises from the violation of a statute is rebuttable and may be overcome by evidence of justification or excuse."

The court went on to discuss previous holdings in California with regard to what would justify the violation of a statute. It then overruled its previous holdings and stated the law to be as follows:

> "In our opinion the correct test is whether the person who has violated a statute has sustained the burden of showing that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law."

The problem, then, is to apply this law to the facts of the case. It is apparent that the appellant did not comply with the ordinance by restoring the street as nearly as possible to its original condition within a reasonable time. The question is whether or not evidence of the statement of the mayor should have been submitted to the jury as justification or excuse on the part of the appellant. This should have been submitted unless men of reasonable minds would agree that it did not constitute a justification or excuse so that the court could declare, as a matter of law, that it was not a justification or excuse. In our opinion, as a matter of law, the fact that the mayor might have told the appellant to leave a hole in the street until the Highway Department filled it up did not constitute justification or excuse for leaving the hole there. We do not feel that the statement of some town official to leave a hole in the street should be considered by the ordinary man using reasonable care as a proper excuse or justification for doing this particular act. There was no emergency. There was ample time for thought and deliberation. It was not an isolated case, but a practice of long standing. There was no reason why the appellant could not restore the street, except inconvenience. We do not consider the testimony as any excuse or justification for leaving a hole in the street contrary to the plain terms and provisions of the ordinance, and we do not believe that such testimony could bring the appellant within the exception noted.

The appellant takes the position that the duty of the town to keep its streets in a reasonable state of repair was a primary duty, and apparently they contend that if the city was not liable, the appellant should not be. It is our opinion that, in this situation, if there is a primary responsibility for the defect in the street, it was upon the party who created it, namely, the appellant. If there is a derivative responsibility, it is

the city which is in the position, rather than the appellant.

Furthermore, there was another question before the jury in connection with the matter of its liability. That was the question of whether or not the town had notice of the defect, or whether it should have known of the defect in the exercise of ordinary care. We cannot know what basis the jury had for not holding the town liable, but that is a possible basis. The appellant has asked us to hold, as a matter of law, that the city either knew of the defect, or that in the exercise of reasonable care it should have known of the defect. We do not believe that we are called upon to rule on this question in the present state of the record.

We believe the real question posed by appellant's argument is whether or not the verdicts were inconsistent, and, if so, whether or not that is ground for discharging appellant. We are not called upon to determine this question, since it was not properly raised. We might point out, in passing, that this court has passed on a similar situation in Miranda v. Halama-Enderstein Co., 1933, 37 N.M. 87, 18 P.2d 1019, 1020, where we said:

> "Finally, it is contended that the cause of action being for a joint tort, and the co-defendant having been found not guilty, it follows that there was no joint tort, and that it was error to go on with the case against appellant as for an individual tort.
>
> "Passing the fact that this proposition is presented here for the first time, we think it unsound. ' * * * Where two or more are sued (for a joint wrong) one cannot complain because another has been dismissed out of court or been acquitted. Though two or more are sued and a joint tort alleged, the general rule is that a recovery may be had against one only.' Cooley on Torts (3d Ed.) 227."

Point 14 of appellant's brief assigns error of the trial court in overruling defendant's motion for a new trial on the asserted grounds that plaintiff's counsel used improper argument before the jury. This motion was made after the arguments were closed and the jury had been placed in the hands of the bailiff, but before they had begun deliberations. This motion set up some fourteen different portions of the argument, to which the appellant objected. Only five of these items of argument were objected to before the jury retired. Then the objection was made without any request for the court to caution or instruct the jury to disregard them. As to the other nine, no objection was made at the time of the argument and no request was made to caution the jury to disregard them. As to those nine portions of the argument, the court had no opportunity to correct them, unless it did so of its own motion, and did not

474

know of the objections in time to do so, unless it called the jury back for that purpose after it had retired. We feel that any objections to the argument of counsel should be made in time for the court to rule on them, and, if necessary, to correct them before the jury retires, unless they are of such a serious nature that they cannot be corrected by a cautionary instruction from the court. We have previously announced the doctrine that, in proper cases, we reserve the right to reverse a judgment even if no objection is made. Griego v. Conwell, 1950, 54 N.M. 287, 222 P.2d 606. However, the nine arguments to which objection was first made in the motion for a new trial, after the jury retired, were not of sufficient consequence to justify a reversal in the absence of timely objection, if they were error at all, which we do not decide.

As before mentioned, there were five portions of the argument to the jury made by one of the attorneys for plaintiff to which objection was timely made. We do not wish to unduly lengthen this opinion and will not set out four of these arguments. We have carefully examined them. Three of them will be passed with the comment that we do not consider them to be reversible error, and the fourth will be passed with the comment that we feel it was provoked by the argument of opposing counsel and was not error. It is not every inaccuracy or flight of oratory that will constitute error. Considerable leeway is left to the trial judge in these matters.

That brings us to one argument of counsel which we feel merits more serious attention. The following argument by one of the plaintiff's attorneys and objection by appellant's attorney appears in the record:

"Now, Members of the Jury, I don't know whether any of you are thirty-eight years of age but if you aren't maybe some of you can think back to that period—you are thirty-eight years of age and you have got about thirty-two years to go; and somebody comes along and says, 'I will offer you a hundred thousand dollars if you cut your limb off and you get along with it on a stump for the rest of your life' would you—

"Mr. Harlan (Interrupting): May it please the Court, may we object to that as inflammatory and asking the Jury to substitute their position for that of the plaintiff.

"The Court: Overruled."

Later in the course of the arguments, another attorney for plaintiff said the following, to which objection was made:

"And I say to you that two hundred fifty thousand dollars wouldn't be too much. I wouldn't take it for my leg; you wouldn't take it for yours."

It is a very difficult thing to determine whether or not an argument made by coun-

sel in the heat of a trial is reversible error or not. Some of the cases take the position that each situation must be judged on its own basis and under all of the facts and circumstances of the case.

The case of Texas & N. O. R. Co. v. Sturgeon, 1944, 142 Tex. 222, 177 S.W.2d 264, 265, decided by the Supreme Court of Texas in 1944, held as follows, in a similar situation:

"We cannot agree with the Court of Civil Appeal's holding with respect to the following statement made to the jury by counsel for respondent in his closing argument: 'I don't think a man on this jury would sell his leg for a hundred thousand dollars.' Counsel for petitioner promptly objected to the statement and requested the trial court to instruct the jury to disregard it and not consider it for any purpose. The objection should have been sustained and the requested instruction given. Prompt action on the part of the court in response to an objection and request would have removed the harmful effect. The language complained of was subject to the inference that the jury was at liberty in fixing the amount of damage to consider what amount one would sell his leg for. Refusal of the judge to sustain the objection increased the harmful effect of such an inference and constituted reversible error. Fam-

brough v. Wagley, 140 Tex. 577, 169 S.W.2d 478; Foster v. Langston, Tex. Civ.App., 170 S.W.2d 250; Brooks v. Enriquez, Tex.Civ.App., 172 S.W.2d 794, 797, wr. dism."

A decision of the Fifth Circuit Court of Appeals, reported as F. W. Woolworth Co. v. Wilson, 1934, 74 F.2d 439, 442, 98 A.L.R. 681, is similar. In this case, counsel asked the jury if they would swallow a glass and put themselves in the position of the plaintiff for a few thousand paltry dollars. The Circuit Court of Appeals held that it was error, and said:

"The appeal to the jury to put themselves in plaintiff's place was improper. One doing that would be no fairer judge of the case than would plaintiff herself."

The texts seem to support this rule. In 88 C.J.S. Trial § 169, p. 338, is found the following statement:

"It is an improper argument to ask the jury to place themselves in the shoes of a party and render such verdict as they would want rendered in case they were so situated."

And in 88 C.J.S. Trial § 191, p. 376, is the following text:

"An appeal to the jurors to place themselves in the position of a party is improper."

There are cases which seem to take a different view. In the case of Adams Ex-

476

press Co. v. Aldridge, 1904, 20 Colo.App. 74, 77 P. 6, 10, the following argument was approved:

> " 'Some of you, many of you, are married men and have families. How much would you take to have your wife run down in the public street, her leg broken, and her body covered with cruel bruises? How much would you take to have your wife run down in the public street and subjected to the curious gaze of the gaping crowd? How much would you take to have your wife knocked from her bicycle, rolled in the dirt in the public street, and humiliated and made the spectacle of a crowd on the public street?' "

It is true that no objection was made to these remarks in the Adams Express Co. case, but the Supreme Court of Colorado stated that the argument was not improper. This is an old case, having been decided in 1904. However, the case has been cited twice in recent years by the Supreme Court of Colorado as authority for the proposition that attorneys have wide latitude in arguing their client's cause. See Spears Free Clinic & Hospital for Poor Children v. Maier, 1953, 128 Colo. 263, 261 P.2d 489; and Gaddy v. Cirbo, 1956, 133 Colo. 243, 293 P.2d 961.

Two cases have come to our attention where the argument suggests to the jurors that they place themselves in the place of the plaintiff. However, in each case, it is impossible to tell from reading the reports whether proper objection was timely made or not. Hence, we do not cite them as authority, but simply for such information as they may give. They are Botta v. Brunner, 1956, 42 N.J.Super. 95, 126 A.2d 32, a New Jersey case; and McCullough v. Langer, 1938, 23 Cal.App.2d 510, 73 P. 2d 649, a California case.

From all of the foregoing, it seems to us that the majority rule is that it is improper to ask the jury to place themselves in the position of the plaintiff and to consider how much they would take to have one of their legs cut off.

That leaves the question of whether or not the impropriety of the argument is reversible error. In this case, we will require a remittitur for the reasons hereinafter set out. The question that presents itself is whether or not that will cure the impropriety of the argument. Our discussion of the question will be with this fact in mind.

In 88 C.J.S. Trial § 192, pp. 378–379, relating to the argument of counsel to the jury and specifically with reference to the matter of damages, is found this portion of a sentence, to wit:

> " * * * and remarks which merely go to the amount of damages, although erroneous, are not ground for reversal because the verdict could be remedied by remittitur if excessive."

In 5B C.J.S. Appeal and Error § 1869, p. 313, is the following comment on the same subject:

"*Improper argument.* The error of a trial court in allowing improper argument by counsel may be cured, on appeal, by a remittitur of the excess of the judgment caused by such argument, provided the excess is ascertainable."

The point might be advanced that there is no way to ascertain that portion of the verdict attributable to the improper argument. However, the case of Dallas Railway & Terminal Co. v. Enloe, Tex.Civ. App.1950, 225 S.W.2d 431, 435, was a personal injury action. The trial court reduced the verdict of the jury and the appellate court further reduced it. It was held that the remittitur cured any improper argument. The court said:

"Too, the remittitur required would render such argument harmless, even if it were considered prejudicial."

Also see Producers' Oil Co. v. Barnes, Tex.Civ.App.1909, 120 S.W. 1023.

A similar conclusion was reached by the Supreme Court of Oklahoma in a recent case, St. Louis-San Francisco Railway Company v. King, Okl.1954, 278 P.2d 845, 850. In both his opening statement and in his argument to the jury, the attorney for the plaintiff in a personal injury case referred to the plaintiff's wife and two children and appealed to the sympathy of the jury.

Testimony to this effect was also introduced. The court said:

"Though the trial judge entertained the expressed idea that some prejudice flowed from the argument to the jury based upon this character of testimony we are unable to see in view of all the circumstances, including the fact that the trial judge reduced the verdict returned by the jury $35,000, how this character of testimony, if error, was prejudicial to the defendant."

There is authority to the contrary, but in this case, under all of the circumstances and conditions and in view of the remittitur which will be required if the judgment is sustained, we feel that the remarks of counsel were not reversible error. We will, however, take them into account in determining whether or not the verdict was excessive. Ostertag v. Union Pac. R. Co., 1914, 261 Mo. 457, 169 S.W. 1.

The final point relied upon by appellant for reversal is that the trial court erred in refusing to set aside the verdict as excessive.

The rules to guide the court in such matters has been established in the cases of Hall v. Stiles, 1953, 57 N.M. 281, 258 P. 2d 386, and Montgomery v. Vigil, 1958, 65 N.M. 107, 332 P.2d 1023. We need not repeat them here.

We have carefully considered the matter, and we find that there is no substantial

evidence to support a verdict of $95,000. We further find the verdict so excessive as to indicate "passion, prejudice, partiality, sympathy, * * * or * * * (that) the jury has mistaken the measure of damages."

We feel that probably the jury was mistaken as to the measure of damages, and that the argument of counsel concerning a leg being worth $100,000 might have contributed to that mistake, since the verdict was so close to that figure.

In the case at bar, the plaintiff was thirty-eight years of age at the time of the accident and had a life expectancy of approximately thirty-two years. He was in the cleaning and pressing business, but his income or earnings were not shown. His leg was previously broken, and he suffered pain from it before the second accident, for which he received shots once or twice a day.

His previous injury had caused an infection of the bone and marrow of the leg known as osteomyelitis, which condition had existed for approximately eighteen months previous to the injury on which this suit was based. His doctor estimated that if the second accident had not occurred, he could have started reconstructive work on the leg in about twelve months from the date of the second injury and that in nine or ten months thereafter the plaintiff would have been cured so that his foot would have been of considerable use to him. He still believed he could heal the leg, but estimated that it would take about a year longer than originally estimated. The patient was discouraged and visited another doctor, who recommended an amputation under the circumstances; so his original doctor, at his request, amputated his leg about six inches below the knee. This procedure required a preliminary amputation, and then later a second amputation, which is the usual procedure to get best results. The plaintiff is able to and does use an artificial limb. If the request to amputate before the second injury had been made, the doctor would not have amputated, but considering the extra time which would be required to heal the leg with the attendant suffering, the doctor acceded to the request. With this history, we are required to determine what damages would be proper as the proximate result of the injury sued upon.

Many cases have been cited in the briefs of the parties hereto, but most of them are not of much value in this case. For instance, the appellee cites Affolder v. New York, C. & St. L. R. Co., 1950, 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683, where a judgment for $80,000 for the loss of a leg was upheld by the supreme court on the ground that it was not monstrous. To begin with, that is not the rule in New Mexico. And, secondly, the leg in the Affolder case was amputated so as to only leave a

stump four inches long from the hip. The stump was adherent, there was a hot spot left, further surgery was required to shorten the bone and cut off scar tissue, and then the artificial limb would have to be of a special type. There was hesitation on the part of the doctor as to the extent of the success of the artificial limb and the flection of the limb would be reduced. Under those circumstances, the jury awarded $95,000 damages and the lower court required a remittitur of $15,000. The lower court, in requiring the remittitur, pointed out that up to 1944 no court had approved a verdict for loss of a leg up to $60,-000 and, in fact, it referred to a case where $40,000 was allowed for loss of a leg three and a half inches above the knee.

We have examined Schweitzer's Cyclopedia of Trial Practice with the supplement up to 1955 at pages 2192 and 2193 relative to verdicts which have been allowed for the loss of one leg. However, the conditions and situations vary so much that any of these cases are not of much weight. Likewise, our own cases don't seem to present a similar situation. We might refer to some of them for what little help they might give.

The jury, in the case of Hall v. Stiles, supra, returned a verdict for the death of a man in the sum of $50,000. That was in 1953. The plaintiff was twenty-four years of age with a life expectancy of 39.49 years, and was earning $2.25 per hour as a structural steel worker. We held that such judgment was not excessive. However, that was a death case.

The case of Rivera v. Atchison, Topeka and Santa Fe Railway Co., 1956, 61 N. M. 314, 299 P.2d 1090, involves a man who had a life expectancy of 15.77 years and was earning about $250 per month. Part of his hand was cut off in an accident, leaving two fingers, apparently the two little fingers. He suffered great pain for fifteen months prior to trial and was still carrying his hand in a sling. Medical experts also testified as to future pain and suffering, and Dr. Boyd was of the opinion that it would be necessary to amputate the hand. The jury gave a verdict for $68,500 and this court sustained it. We said that at first glance it seemed over liberal but that we held that it was not excessive. Judge Sadler dissented on the grounds that it was excessive.

We feel that where an amputation is below the knee and an artificial leg can be worn, that it is perhaps less disabling than the loss of an arm below the elbow. Also in the Rivera case the hand and arm were healthy before the accident. We have not lost sight of the true measure of damages in this kind of case by making that statement. But all of the facts must be considered in arriving at a measure of damages.

From all of the facts herein we feel that the judgment should be reversed unless the

plaintiff shall within fifteen days from the filing of this opinion file in this court a remittitur of the medical bills in the sum of $7,768.87 and a further sum of $47,231.-13, leaving a balance after said remittitur of $40,000, to be the amount of the judgment. Of course, if the plaintiff does not wish to do this the case will be remanded for a new trial.

McGHEE, C. J., and COMPTON and CARMODY, JJ., concur.

MOISE and CHAVEZ, JJ., not participating.